# United States Court of Appeals
## For the First Circuit

No. 13-1428

DAVID PIERCE,

Plaintiff, Appellant,

v.

COTUIT FIRE DISTRICT; BOARD OF FIRE COMMISSIONERS OF THE
COTUIT FIRE DISTRICT; DONALD CAMPBELL, Fire Commissioner of the
Cotuit Fire Department, RONALD MYCOCK, Fire Commissioner of the
Cotuit Fire Department; PETER FIELD, Fire Commissioner of the
Cotuit Fire Department; CHRISTOPHER OLSEN, Fire Chief,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before
Lynch, Chief Judge,
Stahl and Howard, Circuit Judges.

Harold Lichten, with whom Sara Smolik and Lichten & Liss-
Riordan, P.C. were on brief, for appellant.
Marielise Kelly, with whom Edward R. Gargiulo and Gargiulo/
Rudnick, LLP were on brief, for appellees Cotuit Fire District,
Board of Fire Commissioners of the Cotuit Fire District, Donald
Campbell, Ronald Mycock and Peter Field, Fire Commissioners of the
Cotuit Fire Department, and Christopher Olsen, Fire Chief.

January 28, 2014

**HOWARD, Circuit Judge.** Plaintiff-appellant David Pierce, former Captain of the Cotuit, Massachusetts Fire Department, brought a complaint against the Department, the Fire Chief, and the Board of Fire Commissioners, alleging political discrimination in violation of the First Amendment and 42 U.S.C. § 1983, whistleblowing retaliation in violation of the Massachusetts Whistleblower Act, and tortious interference with contractual relations. The district court entered summary judgment in favor of the defendants on all counts. Because we conclude that the defendants have presented legitimate, business-related grounds for their employment decisions and because Pierce has failed to demonstrate that the proffered explanations are pretextual, we affirm.

## I. Facts

The Cotuit Fire Department is a relatively small operation. In rough order of seniority, the Department has five "call" firefighters, six full-time firefighters, three Lieutenants, one Captain, and one Fire Chief. The Department also has a three-member Board of Fire Commissioners ("the Board"), which is in charge of overseeing, appointing, and terminating personnel. At the time of the relevant events, the Captain of the Cotuit Fire Department was David Pierce. Since March of 2008, the Fire Chief has been defendant Christopher Olsen. Until November of 2009, the Fire Commissioners were defendants Donald Campbell, Ronald Mycock,

and Peter Field.  In November, Donald Campbell resigned and was replaced by Brenda Nailor.

### A.  Inter-Departmental Relationships

In the decades leading up to the fall of 2009, the Cotuit Fire Department was the home of some fairly complicated personal histories.  As Captain of the Department, Pierce served directly over his wife, Jayne Pierce, who was a full-time firefighter through the majority of their relationship.  Prior to his marriage to Jayne, Pierce had been married to Donna Pierce (now Donna Fenner), who had been a call firefighter at the time, but had subsequently joined the Department as a full-time firefighter and married fellow firefighter Scott Fenner.  Fenner's own ex-wife, Amy Griffin Fenner, is also a call firefighter.  There was testimony that this pattern of intra-departmental relationships made the Cotuit Fire Department the subject of mockery among neighboring departments, frequently to the consternation of the Department's own employees.  Since the 1990s, firefighters and officers in the department had discussed implementing a stricter policy regarding domestic relationships, though no early discussions materialized into a new policy.

Following their marriage, David and Jayne Pierce were never scheduled to work the same regular 24-hour shift.  They did, however, work together with some regularity when they responded to emergency calls or when one of them volunteered to substitute for

an unavailable firefighter on the other's regular shift. During these times, Pierce directly supervised his wife. In March 2008, Pierce wrote the Massachusetts State Ethics Commission ("Ethics Commission") to request an advisory opinion regarding any potential conflict of interest arising out of his professional relationship with Jayne. On March 31, 2008, the Ethics Commission advised him that the state ethics law, Mass. Gen. Laws ch. 268A, § 19, prohibited him from participating in his wife's supervision, performance evaluations, or promotions, or in setting her compensation. The Commission recommended that he write the Board of Fire Commissioners to disclose the situation and obtain a formal exemption, but Pierce chose not to pursue the matter.

Following his communication with the Ethics Commission, Pierce became directly involved in his wife's employment on at least three occasions. First, in the fall of 2008, Pierce advised Chief Olsen against imposing a probationary period on the tenure of new Lieutenants at a time when Jayne was about to become a Lieutenant. Second, Pierce advised Olsen that a new Emergency Medical Services position should go to a trained paramedic when Jayne was the only trained paramedic in the Department. Finally, in April of 2009, Pierce assisted in a disciplinary investigation involving Jayne's verbal altercation with a subordinate firefighter. Although Pierce had a right to recuse himself and although Jayne specifically requested that he do so, Pierce chose

-4-

to participate after Olsen indicated that he desired Pierce's input in the hearing. Pierce recommended that Jayne receive a counseling session as punishment. However, Olsen ultimately decided to demote Jayne from Lieutenant to firefighter.

In March of 2009, roughly a year after his appointment as Fire Chief and just before Jayne's disciplinary investigation, Olsen circulated a new "Familial Relations Policy" for the Department. Among other things, the policy forbade officers from working regular shifts with or directly supervising their family members. After the policy was circulated, Pierce and Jayne sought legal counsel regarding the policy's repercussions for their careers.

In August of 2009, in response to Jayne's objections to her demotion from Lieutenant, Olsen initiated efforts to investigate an allegedly "hostile environment" in the Cotuit Fire Department. Five full-time firefighters submitted complaints of harassment or intimidation by the Pierces when they were on duty.

## B. The Wool Campaign

In April 2009, Donald Campbell's seat on the Board came up for re-election. Campbell originally ran for re-election unopposed. Concerned about a potential conflict of interest created by Campbell's status as an active union firefighter, however, Pierce actively encouraged William Wool to enter the race as a write-in candidate.

At Pierce's request, Commissioner Mycock agreed to meet with Wool to discuss Wool's interest in serving on the Board. Mycock did not discourage Wool from running and, while he did not take a position on Wool's candidacy, he agreed that Campbell's union ties created a conflict of interest. Mycock's concerns were echoed by Commissioner Field, although Field did not take a public position on Wool's campaign either. Mycock did have Olsen advise Pierce not to campaign for Wool while on duty or to use Department resources in his campaigning. Pierce complied with both requests.

Throughout the month of May, Pierce campaigned for Wool by handing out flyers, talking to acquaintances about the election, and displaying a campaign sign for Wool on election day. On one occasion, Pierce was off-duty and campaigning for Wool outside the town Post Office when Olsen drove by and indicated that he wanted Pierce's assistance at an emergency call. Reporting to emergency calls is voluntary for off-duty firefighters, and Pierce declined Olsen's request. The next day, Olsen told Pierce that he wished that Pierce had responded to the call. Olsen also mentioned that he was "concerned" about "losing Campbell" as a Commissioner during the upcoming election.

Campbell ultimately won reelection. Following the election, according to Pierce's testimony, Olsen told Pierce that he was "not happy" that Pierce had campaigned for Wool. Olsen also opined that it was "inappropriate" for Pierce to have campaigned

outside the fire station on a separate occasion.  Campbell stopped by Pierce's office during the same period, ostensibly to assure Pierce that he had no hard feelings, but he ultimately expressed disappointment and frustration with Pierce over his support for Wool.

### C.  Retaliation and Ethics Complaints

On October 2, 2009, four months following his campaigning activity, Pierce sent a letter to the Board claiming that Olsen had been retaliating against him ever since the election due to his support of Wool.  Pierce cited a variety of forms of harassment starting in the weeks following the election.  He reported that Olsen had reneged on his promise to make Pierce "Deputy Chief," taken away Pierce's office and made him return his Department-issued cell phone, called Pierce and his wife "greedy" for volunteering for overtime, and publicly lashed out at Pierce and two other firefighters for failing to prepare for a memorial ceremony.  While Olsen did not respond to Pierce's charges at the time, he later contended that he needed to re-purpose Pierce's office into new sleeping quarters due to space constraints and that it would be more efficient to turn Pierce's work cellphone into a department-wide phone for on-duty officers.

The Board replied to Pierce with a letter indicating that his complaint did not conform to the grievance process prescribed by the Department's collective bargaining agreement and took no

further actions on his charges. Because Pierce's letter criticized Olsen's treatment of both Pierce and his wife, however, the Board did take the occasion to remind Pierce of his obligations under the Massachusetts ethics laws and to suggest that Pierce contact the Ethics Commission for an advisory opinion regarding his professional relationship with Jayne.

On November 20, 2009, the Board sent its own letter to the Ethics Commission to request that the Commission conduct an evaluation of Pierce's potential conflict of interest, copying Pierce on the communication. Among other things, the letter informed the Commission that Pierce had "regular supervisory authority over and day to day supervision of his wife," and that Pierce had participated in a disciplinary matter involving Jayne in April. The letter was signed by Mycock and Field, but not by Campbell, who had resigned the previous day. While the Ethics Commission considered the Board's letter, Pierce wrote the Board to request a formal exemption under Mass. Gen. Laws ch. 268A, § 19 for his and Jayne's joint employment in the Department. The letter estimated that Pierce supervised his wife on ten to twelve occasions per year. The Board declined to take up Pierce's request while it awaited a response from the Ethics Commission.

On June 17, 2010, the Ethics Commission sent Pierce a confidential letter informing him that he appeared to be in violation of Mass. Gen. Laws ch. 268A, § 19. To remedy the

situation, the Commission suggested that Pierce should obtain an exemption, restructure his position so as to have no day-to-day supervision of Jayne, or either he or Jayne could resign. On June 24, 2010, Pierce replied to the Ethics Commission to clarify that he did not have "day-to-day active supervision" of his wife. In the same letter, on which Olsen was copied, Pierce suggested that the Board had refused to grant him an exemption in retaliation for certain unrelated claims that he and Jayne were pursuing against the Town of Cotuit. The Board responded directly to the Ethics Commission, again raising the issue of Pierce's supervision of Jayne and his involvement in her discipline and promotion.

On June 18, 2010, presumably without knowledge of the letter Pierce had received from the Ethics Commission the previous day, Olsen notified Pierce of his intent to suspend him with pay. Olsen attributed his decision to an independent conclusion reached by the Board's counsel that Pierce was violating the state ethics law. He instituted the suspension following a hearing later that month. Subsequently, Olsen and the Board became aware of the Commission's June 17, 2010 letter. On November 29, 2010, after a hearing at which the letter was discussed, Olsen suspended Pierce without pay. Olsen again explained that his disciplinary action responded to Pierce's violations of Mass. Gen. Laws ch. 268A.

On January 11, 2011, the Commission sent Pierce a final confidential letter, informing him that the Commission had found

"facts sufficient to find reasonable cause to believe" that Pierce was violating the ethics law. Two weeks later, the Commission responded directly to the Board regarding its November 20, 2009 complaint against Pierce. While noting that its "decision does not necessarily mean that your complaint was without merit," the Commission determined that the matter "does not warrant further investigation or the imposition of formal sanctions at this time."

On April 20, 2011, despite the Commission's failure to impose sanctions, the Board chose to terminate Pierce's employment.

### D. Administrative and Legal Actions

On December 3, 2010, Pierce initiated this action against the Cotuit Fire Department, the Board, and Chief Olsen and Commissioners Campbell, Mycock, and Field in their individual capacities. Pierce sued the Department and the Board for political discrimination in violation of the First Amendment and for retaliation in violation of the Massachusetts Whistleblower Act. He sued Olsen, Campbell, Mycock, and Field for political discrimination and retaliation in violation of 42 U.S.C. § 1983 and for tortious interference with contractual relations in violation of the common law.

That same day, Pierce also initiated a "step one" grievance against Olsen regarding his suspension without pay under the Cotuit Fire Department's Collective Bargaining Agreement. On

December 19, 2010, Pierce submitted a "step two" grievance regarding the same matter.

On May 8, 2011, less than a month after Pierce's termination, the Board entered into a settlement agreement with the firefighter's union that permitted Pierce to return to work as a full-time firefighter, while restricting Pierce's ability to work on any shift with his wife. The union consequently withdrew a scheduled arbitration regarding Pierce's grievances. Pierce objected to the settlement, but eventually returned to work as a firefighter.

After the defendants moved for summary judgment, the district court entered judgment in their favor on all claims. Pierce now appeals.

## II. Discussion

We review a district court's grant of summary judgment de novo, construing the record in the light most favorable to the non-moving party and resolving all reasonable inferences in that party's favor. Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008). We cannot affirm if the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side. Id. at 40; Maymí v. P.R. Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008). Inversely, we must affirm if the record reveals no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Vineberg v.

Bissonnette, 548 F.3d 50, 55 (1st Cir. 2008); Fed. R. Civ. P. 56(c).  We are not limited to the district court's rationale, but may affirm on any grounds made manifest by the record.  Jones v. Secord, 684 F.3d 1, 5 (1st Cir. 2012).

### A.  First Amendment Retaliation

Pierce claims that Olsen and the Board's decisions to suspend and ultimately terminate him as Captain, as well as Olsen's pattern of hostile conduct in the summer of 2009, constitute retaliation for his political support for Wool as Fire Commissioner.

It is well established that political discrimination by a state employer, including retaliation for a contrary political opinion, violates the freedom of belief and association protected by the First Amendment.  See Padilla-Garcia v. Guillermo Rodriquez, 212 F.3d 69, 74 (1st Cir. 2000).  As a core constitutional violation, employment retaliation for protected political and expressive activity also creates individual liability under 42 U.S.C. § 1983, subject to the rules of qualified immunity.  Powell v. Alexander, 391 F.3d 1, 16 (1st Cir. 2004).  To qualify for relief under the First Amendment or under § 1983, an employee's claim must survive the burden-shifting analysis enunciated in Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274 (1977).  See Powell, 391 F.3d at 17.  First, the employee must demonstrate that he engaged in protected First Amendment conduct

and that this conduct "was a substantial or motivating factor" in his employer's adverse employment action. <u>Welch</u> v. <u>Ciampa</u>, 542 F.3d 927, 936 (1st Cir. 2008); <u>see also</u> <u>Mt. Healthy</u>, 429 U.S. at 287. An employer may subsequently avoid liability by establishing that it "would have taken the same action regardless of the plaintiff's political beliefs or protected conduct." <u>Welch</u>, 542 F.3d at 936; <u>Padilla-Garcia</u>, 212 F.3d at 74; <u>see also</u> <u>Mt. Healthy</u>, 429 U.S. at 287. Finally, the burden shifts back to the plaintiff to "discredit the . . . nondiscriminatory reason, either circumstantially or directly, by adducing evidence that discrimination was more likely than not a motivating factor." <u>Padilla-Garcia</u>, 212 F.3d at 77.

Based on the record, Pierce's claim against neither the Board nor Olsen survives the <u>Mt. Healthy</u> framework. With regard to the Board, Pierce has offered no evidence that the Commissioners had any political motivations in their treatment of him. Pierce has not suggested that either Mycock or Field opposed Wool for Commissioner, and indeed the record reveals that both Commissioners shared Pierce's concern that Campbell had an undesirable conflict of interest. While a jury might be able to infer that Campbell took issue with Pierce's opposition to his candidacy, Campbell resigned from the Board before either Pierce's suspension or termination took place. Even granting Pierce the inference that Campbell may have been involved with drafting the Board's November

-13-

10, 2009 letter to the Ethics Commission, that letter sought only the Commission's opinion on Pierce's potential conflict of interest. Pierce does not contend that Campbell influenced the Board's decision to terminate Pierce over a year later. He consequently fails to make even a prima facie showing of political discrimination against the Board.

Pierce has adduced far more substantial evidence that Olsen objected to Pierce's political support of Wool. Assuming that Pierce has stated a prima facie case of political retaliation against Olsen, however, Pierce's claim fails at the second Mt. Healthy step. The record identifies a legitimate and non-discriminatory justification for each instance of Olsen's "harassment" of Pierce following the election. Olsen re-purposed Pierce's office because the Department was tight on space. He took back Pierce's cellphone because it was more efficient to make the phone available to all on-duty officers. He failed to make Pierce "Deputy Chief" because no such position had ever existed nor exists now in the Department. He upbraided Pierce in connection with the memorial ceremony because Pierce was unprepared for an official duty, and included several other offending firefighters in his reproach.

Pierce leans heavily on Olsen's decision to suspend him without pay in the summer of 2010 even though less drastic options, such as an immediate demotion, were available. Yet Olsen's

-14-

decision is directly explained by his objections to Pierce's ongoing ethics violation as Captain of the Department, and Pierce's claims that this explanation is pretextual are purely speculative. While Pierce repeatedly notes that Olsen could have chosen a less extreme remedy, he does not deny that Olsen's actions were within the reasonable range of responses to Olsen's concerns about Pierce's professional relationship with his wife. Nor does Pierce offer any evidence that such concerns would not have justified Olsen's actions in the regular course of conduct--for example, evidence that other Fire Chiefs treated similarly-situated officers more leniently.

The district court properly entered summary judgment in favor of the defendants on Pierce's First Amendment claim.

### B. Whistleblower Retaliation

Pierce further contends that the Board's instigation of an ethics investigation against him and its ultimate termination of his employment violated the Massachusetts Whistleblower Act ("MWA"), Mass. Gen. Laws ch. 149, § 185 et seq. Pierce suggests that the Board retaliated against him for his October 2, 2009 letter objecting to Olsen's harassment or for his June 24, 2010 letter to the Ethics Commission objecting to the Board's refusal to grant him an exemption.

Pierce's challenge may sound under either section 185(b)(1) or section 185(b)(3) of the MWA.[1] Section 185(b)(1) prohibits a state employer from retaliating against an employee who "[d]iscloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer . . . that the employee reasonably believes is in violation of a law." Mass. Gen. Laws ch. 149, § 185(b)(1). Section 185(b)(3) of the statute prohibits an employer from retaliating against an employee who "[o]bjects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes is in violation of a law." Id. § 185(b)(3). To qualify for protection under section 185(b)(1), but not under section 185(b)(3), an employee must first "br[ing] the activity, policy or practice . . . to the attention of a supervisor of the employee by written notice and . . . afford[] the employer a reasonable opportunity to correct the activity, policy or practice." Id. § 185(c)(1).

While the two causes of action are quite distinct, a plaintiff's burden of proof under the MWA closely parallels his burden for First Amendment discrimination under Mt. Healthy. To prevail on an MWA claim, an employee must show "that he engaged in protected activity and that his participation in that activity played a substantial or motivating part in the retaliatory action."

---

[1] Because Pierce did not identify which provision of the MWA underwrites his claim, we follow the district court in analyzing both sections as the most plausible options.

-16-

Welch, 542 F.3d at 943; see also Larch v. Mansfield Mun. Elec. Dep't, 272 F.3d 63, 67 (1st Cir. 2001). The employer may subsequently avoid liability "by proffering a legitimate, nonretaliatory reason for the [adverse action]." Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 262 (1st Cir. 1999). The burden then shifts back to the employee to "adduce some significantly probative evidence showing both that the proffered reason is pretextual and that a retaliatory animus sparked his dismissal." Id.

The parties spend some time debating whether Chief Olsen qualifies as an "employer" or merely a "supervisor" under the MWA, and subsequently whether Pierce's October 2, 2009 letter to the Board disclosed an unlawful "practice of the employer" under section 185(b)(1).[2] The parties also debate whether Pierce's June 24, 2010 letter to the Ethics Commission, directly accusing the Board of retaliation for an unrelated legal dispute, satisfied section 185(c)(1)'s notification requirement.

---

[2] The Massachusetts statute defines the "Employer" subject to its provisions as "the commonwealth, and its agencies or political subdivisions, including, but not limited to, cities, towns, counties and regional school districts, or any authority, commission, board or instrumentality thereof." Mass. Gen. Laws ch. 149, § 185(a)(2). The statute defines a "Supervisor" separately, as "any individual to whom an employer has given the authority to direct and control the work performance of the affected employee, [or] who has authority to take corrective action regarding the violation of the law, rule or regulation of which the employee complains." Id. § 185(a)(4).

We do not reach these issues, because, as with his First Amendment challenge, Pierce's claim under the MWA fails at the second step of the burden-shifting framework. Even assuming that Pierce could establish a prima facie case of retaliation by the Board based on either his October 2, 2009 or his June 24, 2010 letter, the Board has offered an independent and legitimate motive for its adverse employment actions: its objections to Pierce's potential violations of Mass. Gen. Laws ch. 268A, § 19. Pierce emphasizes the suspicious proximity between his October 2, 2009 complaint to the Board against Olsen and the Board's prompt instigation of an ethics investigation against him. Yet the Board does not suggest the timing was purely coincidental: by simultaneously protesting both his and Jayne's treatment in the same professional communication, Pierce's letter brought his potential ethics violation back to the Board's attention. The record corroborates that the months before Pierce's letter had witnessed revitalized efforts to combat intra-departmental nepotism at the Cotuit Fire Department, not least through Olsen's release of an updated Familial Relations Policy that March--well before Pierce's support of Wool during the spring election. Pierce's letter also followed soon on the heels of Olsen's August 2009 investigation of a "hostile environment" at the Department, which yielded complaints against the Pierces by nearly half of the Department's employees. The record fully supports the Board's

claim that its ethics investigation, and its subsequent termination of Pierce, responded to genuine and timely concerns about Pierce's professional conduct as Captain.

The district court properly entered summary judgment in favor of the defendants on Pierce's MWA challenge.

C. Tortious Interference with Contractual Relations

Finally, in a pendent state claim, Pierce claims that Chief Olsen and Commissioners Campbell, Mycock, and Field tortiously interfered with his employment contract with the Cotuit Fire Department.

To support a claim of tortious interference with contractual relations, a plaintiff must prove that: "(1) he had a contract with a third party; (2) the defendant knowingly interfered with that contract . . . ; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." O'Donnell v. Boggs, 611 F.3d 50, 54 (1st Cir. 2010) (quoting Harrison v. NetCentric Corp., 744 N.E.2d 622, 632 (Mass. 2001)). Because a defendant may tortiously interfere only with a plaintiff's contract with a third party, an employee cannot bring a claim of tortious interference with an employment contract against his own employer. Harrison, 744 N.E.2d at 632. However, an employee may bring a claim against a supervisor if he demonstrates that the supervisor acted "out of malevolence, that

is, with actual malice."  Blackstone v. Cashman, 860 N.E.2d 7, 13 (Mass. 2007) (quoting Gram v. Liberty Mut. Ins. Co., 429 N.E.2d 21, 24 (Mass. 1981)) (internal quotation marks and citations omitted); see also O'Donnell, 611 F.3d at 54 n.3.  A showing of actual malice requires "more than a showing of mere hostility."  Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 76 (1st Cir. 2001).  A plaintiff must show that malice "was the controlling factor in the supervisor's interference"; that the inference of malice is "probab[le] rather than possib[le]"; and that the evidence affirmatively suggests  the supervisor's actions "were not derived from a desire to advance the employer's legitimate business interests."  Id. at 76-77.

In this case, Commissioners Campbell, Mycock, and Field were all signatories to Pierce's employment contract with the Cotuit Fire Department.  It is thus questionable whether they can be viewed as "supervisors" so as to create liability under the common law.  Even assuming that all four defendants are "supervisors" liable for tortious interference, however, Pierce has failed to establish that any of them acted with "actual malice."  As discussed above, all of the named defendants had legitimate business reasons for their adverse actions against Pierce--most notably, their genuine concerns about the Department's violation of the Massachusetts ethics laws.  Pierce has not demonstrated that

probable malice was the controlling factor behind the Commissioners' or Olsen's employment decisions.

The district court properly entered summary judgments in favor of the defendants on Pierce's tortious interference claim.

### III.  Conclusion

For the foregoing reasons, the district court's grant of summary judgment is affirmed as to all claims.